IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

|  |  |
|---|---|
| IN RE | ) |
| ANTHONY SHAD CUNDIFF, | ) CASE NO. 14-80112-G3-7 |
| Debtor, | ) |
| SUCHMOR THOMAS, ET AL., | ) |
| Plaintiffs, | ) |
| v. | ) ADV. NO. 14-8007 |
| ANTHONY SHAD CUNDIFF, | ) |
| Defendant. | ) |

## MEMORANDUM OPINION

The court has held a trial in the above captioned adversary proceeding. The following are the Findings of Fact and Conclusions of Law of the court. A separate Judgment will be entered denying the relief requested by the Plaintiffs. To the extent any of the Findings of Fact are considered Conclusions of Law, they are adopted as such. To the extent any of the Conclusions of Law are considered Findings of Fact, they are adopted as such.

### Findings of Fact

#### Background

Anthony Shad Cundiff ("Debtor") filed a voluntary petition under Chapter 7 of the Bankruptcy Code on March 26, 2014.

Debtor testified that, prior to 2010, he ran a division of a construction company. He testified that, during 2010, he foresaw a business opportunity because there was only one supplier for sand and gravel aggregate within an eight county area near Victoria, Texas. He testified that, along with Oscar Garcia and Rene De La Cruz, he formed State Materials, LLC, ("State Materials") during February, 2011, in order to mine sand and gravel aggregate, wash the aggregate, and sell the aggregate for use in the manufacture of concrete.

Debtor testified that he invested everything he had, which was approximately $40,000, into State Materials.

Tom Evans testified that he met with Debtor during 2010, at which time Debtor presented him with a business plan. Evans testified that during 2011, he introduced Plaintiff Suchmor Thomas to Debtor. Evans testified that his initial introduction of Thomas to Debtor took place several months before Thomas invested in State Materials.

Thomas invested $250,000 in State Materials in the belief that it would perform financially, and would generate profit sufficient to pay him a royalty on aggregate mined, and provide him with a hefty return upon sale of the company. State Materials failed, and Thomas lost his investment. Debtor also lost his investment. State Materials breached its contract to Thomas, but as set forth below, there is insufficient evidence of

fraud on Debtor's part to award nondischargeable damages to Thomas.

## Investment Meetings

Evans testified that Debtor met with Evans and Thomas on December 31, 2011, and again the weekend of January 7-8, 2012, in order for Debtor to solicit Thomas' investment in State Materials.[1]

At the Investment Meetings, Debtor presented State Materials' business plan to Thomas. The business plan consists of a front cover page, followed by a two-page executive summary, a three-page narrative mine analysis, 15 pages of bore logs, three additional pages of narrative, an unexecuted purchase order, and an additional 21 pages of narrative. (Plaintiffs' Exhibit 1b).

The front cover page of the business plan states that it covers 480 acres located along the Guadalupe River in Victoria, Texas. (Plaintiffs' Exhibit 1b).

Debtor testified that the 480 acres identified on the cover page consists of a 247 acre tract owned by Dorothy Smith Hartman (the "Hartman Property"), plus property on Smith Road, adjacent to the Hartman Property, owned by Maurice Hastey and

---

[1] Collectively, the meetings on December 31, 2011 and the weekend of January 7-8, 2012 are referred to as the "Investment Meetings."

Loretta Hastey (the "Smith Road Property").[2]  Debtor testified that, when he prepared the business plan for State Materials, State Materials did not own or lease any property.

Debtor testified that, at the Investment Meetings, he told Thomas that State Materials' business was good.  Debtor testified that he believed that sales were trending well during 2011.

Debtor testified that he explained to both Thomas and Evans that State Materials needed the Smith Road Property in order to become profitable.  He testified that State Materials wanted to purchase the Smith Road Property because the "lion's share" of aggregate was located on that property.

Thomas testified that Debtor never mentioned the Smith Road Property in Investment Meetings.

Evans testified, when called by Plaintiffs, that, during the 2010 meeting and the Investment Meetings, Debtor never mentioned the Smith Road Property.  Evans was recalled by Debtor, after Debtor's testimony refreshed his recollection that Debtor had mentioned a property described as the "Oxbow Property."

Debtor testified that the Oxbow Property is the same property variously described by the parties as the "Smith Road

---

[2]In order to avoid confusion, except where the question of how the property was identified is important to the analysis of the facts in the instant adversary proceeding, the court will refer to the property adjacent to the Hartman Property as the "Smith Road Property."

4

Property" and the "Hastey Property."

Evans testified that Debtor's mention of the "Oxbow Property" took place at Evans' first meeting with Debtor, at which Thomas was not present. He testified that he does not recall Debtor mentioning the "Oxbow Property" at the Investment Meetings.

### Business Plan

The front cover page of the business plan states that it covers 480 acres located along the Guadalupe River in Victoria, Texas. (Plaintiffs' Exhibit 1b).

The executive summary of State Materials' business plan states in pertinent part a value of $132 million in sand and gravel deposits. (Plaintiffs' Exhibit 1b).

The mine analysis and bore logs as reflected on the copy of the State Materials business plan admitted into evidence are not legible. (Plaintiffs' Exhibit 1b).

Debtor testified that he gave Thomas and Evans better copies of the business plan than that admitted into evidence. Debtor testified that the mine analysis and bore logs include estimates of the amounts of sand and gravel for both the Hartman Property and the Smith Road Property. Both Thomas and Evans testified that they were unable to read the copy of the bore logs admitted into evidence.

Additional Solicitation Materials

Plaintiffs' Exhibit 2a begins with a one-page executive summary. It provides in pertinent part:

> State Materials is soliciting your financial services necessary for the day-to-day activities at our location which will secure our position in the area and help establish the goals set forth above. The implemented changes made with your assistance will allow State Materials to reduce a very substantial amount of overhead, completely dissolve the use of all rental equipment, increase our overal productivity and efficiency and increase our asset base. Profit margins in the 50% range can be expected once the plant is running at optimum efficiency. A detailed User Proceed Schedule is attached to this letter for you to review.

(Plaintiffs' Exhibit 2a).

The documents following the executive summary in Plaintiffs' Exhibit 2a are a one-page schedule providing for the disbursement of approximately $3.9 million over six months; a one-page plant expansion diagram; copies of three quotes and two purchase orders for the sale of aggregate; monthly sales summaries for June, 2011 through October, 2011; a listing of assets; a balance sheet; and a profit and loss statement. (Plaintiffs' Exhibit 2a).

The monthly sales summaries indicate that State Materials' sales totaled $81,576.60 for June, 2011; $227,282.07 for July, 2011; $526,099.16 for August, 2011; $126,196.87 for September, 2011; and $331,387.73 for October, 2011. (Plaintiffs' Exhibit 2a).

Debtor testified that he gave Plaintiffs' Exhibit 2a to Thomas at the Investment Meetings.  Thomas testified that he never received Plaintiffs' Exhibit 2a.  The court finds that Thomas did not receive Plaintiffs' Exhibit 2a.[3]

State Materials' Operations Prior to Plaintiff's Investment

On October 6, 2010, Debtor entered into a contract to purchase the Smith Road Property from Maurice Hastey and Loretta Hastey.  The contract called for Debtor to pay $722,083 for the 232.93 acre tract, and called for closing within 120 days after execution of the contract.  On April 13, 2011, the parties to the contract agreed to extend the contract through April 14, 2011, with options to further extend Debtor's contract to purchase the Smith Road Property conditioned upon Debtor's payment of escalating option fees to the sellers.  (Plaintiffs' Exhibit 1w). Debtor testified that neither he nor State Materials ever closed the purchase of the Smith Road Property.[4]

---

[3]The court notes that, if Thomas received Plaintiffs' Exhibit 2a before he made his investment, taking Thomas subsequent credible testimony into consideration, he likely would not have made the investment.

[4]Debtor testified that he paid at least $53,000 in option fees to the sellers prior to the failure of State Materials to acquire the property.

Debtor testified that in 2010, he began seeking bank financing in order to acquire the Smith Road Property and execute State Materials' business plan.

On April 22, 2011, State Materials executed a 15-year lease agreement to mine sand and gravel on the Hartman Property. (Plaintiff's Exhibit 1i).[5]

Debtor testified that State Materials commenced mining operations on the Hartman Property in April, 2011.  He testified that the Hartman Property contained only approximately $5 million worth of aggregate.

During the period of January, 2011 through November, 2011, State Materials had gross sales of approximately $3 million.  State Materials had a net loss for that time period of $183,781.65.  (Plaintiffs' Exhibit 2t).

Thomas testified that he would not have invested in State Materials if he had known that State Materials had a net loss.

On December 31, 2011, the date of the first of the Investment Meetings, a bank account owned by State Materials had balance of negative $399.34.  Thomas testified that he would not have invested in State Materials if he had known that State Materials had a negative bank account balance.

---

[5]This exhibit label consists of the numeral 1, and the lowercase letter i.

Debtor testified that he explained to Thomas that State Materials was a startup business and was not presently profitable. He testified that he did not provide profit and loss statements to Thomas. He testified that he authorized Thomas to request information from State Materials' accountant and its banker.

Thomas testified that he never requested information from State Materials' accountant or its banker. He testified that he relied only on the business plan and statements made by Debtor.

### Thomas' Investment

Thomas testified that he invested $250,000 in State Materials. He testified that he borrowed the money to make the investment. He testified that his investment in State Materials was his first investment. He testified that, in making the investment, he relied on the business plan presented by Debtor, and Debtor's statement that State Materials' business was good.

Thomas' investment of $250,000 in State Materials took the form of the purchase of a royalty. State Materials agreed to pay Thomas a royalty of $0.125 per short ton of aggregate sold for three years, plus a return of $400,000 when State Materials was sold. The royalty was to be paid quarterly. (Plaintiffs' Exhibits 1c, 1d). Thomas testified that he received only one

royalty payment, in the amount of $5,818.46.

<u>State Materials' Finances and Operations After Thomas' Investment</u>

Debtor testified that he reached an agreement with Security Bank for a loan to State Materials of $2.4 million. He testified that the trend in State Materials' sales attracted the notice of Security Bank.

Debtor testified that in January, 2012, one day before State Materials' borrowing from Security Bank was scheduled to close, Security Bank sought to reduce the amount of the loan. He testified that Security Bank offered to fund one-third of the amount of the loan, with an additional one-third to be advanced three months later. Debtor testified that Security Bank advanced $830,000 during January, 2012.

Debtor testified that $200,000 of the $250,000 invested by Thomas was used to purchase a certificate of deposit which was given as collateral to Security Bank for its' $830,000 loan. He testified that the remaining $50,000 was used for State Materials' operating expenses.

Debtor testified that the $830,000 proceeds of the Security Bank loan was not used to purchase the Smith Road Property. He testified that, at the direction of Security Bank, most of the loan proceeds were used to pay outstanding accounts payable. He testified that the remainder went to purchase equipment that State Materials previously had been renting.

Debtor testified that, during the same week in February or March, 2012, State Materials' two largest customers, who had accounted for approximately 90 percent of State Materials' sales of aggregate, suddenly stopped purchasing aggregate. He testified that when he inquired as to why the two customers were no longer purchasing aggregate, he was told that their projects were "between phases," and that they anticipated returning to purchasing aggregate during June, 2012.

Debtor testified that, in June, 2012, when the two largest customers returned, State Materials began having equipment failures and, because State Materials lacked the capital to have redundant systems, the equipment failures resulted in halted production of aggregate. He testified that State Materials was unable to keep up with demand, and that the customers no longer sought to purchase aggregate from State Materials.

Debtor testified that he ultimately surrendered his interest in State Materials. He testified that he lost his entire investment.

In the instant adversary proceeding, Plaintiffs seek a determination that Debtor owes a nondischargeable debt to Thomas, on grounds he solicited Thomas' investment in State Materials by

11

fraud.[6] Plaintiffs assert that Debtor misrepresented that State Materials had the right to mine aggregate from the Smith Road Property; that Debtor misrepresented that Thomas would recover royalties and the promised $400,000 return on his investment; and that Debtor concealed State Materials' financial condition (which Plaintiffs allege was worsening) from Thomas.

<u>Conclusions of Law</u>

Section 523(a)(2) of the Bankruptcy Code provides in pertinent part:

> (a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt--
>
>> (2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by--
>>
>>> (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;
>>>
>>> (B) use of a statement in writing--
>>>
>>>> i) that is materially false;
>>>> (ii) respecting the debtor's or an insider's financial condition;
>>>> (iii) on which the creditor to whom the debtor is liable for such money,

---

[6]The complaint also purports to contain claims under Sections 548 and 727 of the Bankruptcy Code, and under Texas law. Plaintiffs presented no evidence in support of a claim under Section 727. A cause of action under Section 548, if one exists, would belong to the Chapter 7 Trustee, not to Plaintiffs. In the event, Plaintiff presented evidence only as to the claims under Sections 523(a)(2)(A) and 523(a)(2)(B) of the Bankruptcy Code.

>                    property, services, or credit reasonably
>                    relied; and
>                    (iv) that the debtor caused to be made
>                    or published with intent to deceive.

11 U.S.C. § 523(a)(2).

Exceptions to discharge must be strictly construed against a creditor and liberally construed in favor of a debtor so that the debtor may be afforded a fresh start. <u>In re Hudson</u>, 107 F.3d 355 (5th Cir. 1997).

For a debt to be nondischargeable under Section 523(a)(2)(A), the creditor must show (1) that the debtor made a representation; (2) that the debtor knew the representation was false; (3) that the representation was made with the intent to deceive the creditor; (4) that the creditor actually and justifiably relied on the representation; and (5) that the creditor sustained a loss as a proximate result of its reliance. <u>In re Acosta</u>, 406 F.3d 367 (5th Cir. 2005) (<u>citing</u> <u>In re Mercer</u>, 246 F.3d 391 (5th Cir. 2001).

An intent to deceive may be inferred from a reckless disregard for the truth or falsity of a statement combined with the sheer magnitude of the resultant misrepresentation, but an honest belief, even if unreasonable, that a representation is true and that the speaker has information to justify it does not amount to an intent to deceive. <u>In re Martin</u>, 963 F.2d 809 (5th Cir. 1992).

Justifiable reliance under Section 523(a)(2)(A) is a

matter of the qualities and characteristics of the particular plaintiff and the circumstances of the particular case, rather than the application of a community standard of conduct in all cases.  Field v. Mans, 516 U.S. 59, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995).

Under Section 523(a)(2), false representations and false pretenses encompass statements that falsely purport to depict current or past facts.  Matter of Bercier, 934 F.2d 689 (5th Cir. 1991).

In In re Mercer, the Fifth Circuit held:  "When one has a duty to speak, both concealment and silence can constitute fraudulent misrepresentation; an overt act is not required."  Mercer, 246 F.3d 391, at p. 403.  However, the Fifth Circuit subsequently has held that an affirmative representation is required.  In re Ritz, 787 F.3d 312 (5th Cir. 2015).

In the instant case, Plaintiffs first assertion is that Debtor misrepresented that State Materials had a present authority to mine the Smith Road Property, and needed the Smith Road Property in order to make the payments contemplated under the royalty agreement.

The question of whether Debtor misrepresented current or past facts can be divided into two separate questions: whether Debtor made a representation, and whether any such representation was false.

14

Debtor presented the business plan to Thomas. The business plan contains detailed information regarding the Hartman Property and the Smith Road Property, but the portion addressing which of the information pertains to the Hartman Property, and which pertains to the Smith Road Property is not legible.

Nothing in the business plan addressed whether State Materials owned the Smith Road Property. The only affirmative representation addressing the Smith Road Property in the business plan is the statement "480 Acres Located along the Guadalupe River in Victoria, Texas" on the front cover of the business plan. The court finds that this statement, by itself, does not constitute an affirmative representation as to current facts.

The parties to the instant adversary proceeding each have self-serving recollections as to whether Debtor discussed the Smith Road Property at the Investment Meetings. The best evidence regarding Debtor's verbal statements regarding the Smith Road Property at the Investment Meetings is the testimony of Tom Evans, who is not a party to these proceedings. Evans' testimony is that he recalls Debtor mentioning the Smith Road Property (which Debtor called the Oxbow Property), but not at a meeting at which Thomas was present. The court finds that the evidence does not support a conclusion that Debtor's statements at the Investment Meetings indicated that State Materials had a present authority to mine the Smith Road Property.

Plaintiffs' second contention is that Debtor misrepresented that Thomas would recover royalties and the promised $400,000 return on his investment. To the extent there was such an affirmative representation, such a representation addressed future facts, not past or present facts, and in light of <u>Bercier</u>, does not constitute a debt incurred by false representation or false pretenses.

Plaintiffs' third contention is that Debtor concealed State Materials' financial condition. Plaintiffs did not present sufficient evidence for the court to conclude that Debtor made an affirmative representation regarding State Materials' financial condition, or that any such representation was false. The court concludes that the relief requested under Section 523(a)(2)(A) of the Bankruptcy Code should be denied.

Section 523(a)(2)(B) addresses only a statement in writing respecting the debtor's or an insider's financial condition. With respect to such a statement, Section 523(a)(2)(B) requires that reliance by the plaintiff be reasonable. <u>Field v. Mans</u>, 516 U.S. 59, 116 S. Ct. 437, 133 L. Ed. 2d 351 (1995).

Moreover, Texas law does not recognize a general duty to disclose facts in a commercial setting when a party makes a partial disclosure that, although true, conveys a false impression. <u>In re Bentley</u>, 531 B.R. 671 (Bankr. S.D. Tex. 2015),

16

citing Bradford v. Vento, 48 S.W.3d 749 (Tex. 2001).

Plaintiffs' evidence is that the only statements in writing on which Thomas relied in making his investment are those contained in the business plan. There are no statements in the business plan respecting the Debtor's financial condition or that of State Materials. The court concludes that the relief requested under Section 523(a)(2)(B) of the Bankruptcy Code should be denied.

Based on the foregoing, a separate Judgment will be entered denying the relief requested by the Plaintiffs in the above captioned adversary proceeding.

Signed at Houston, Texas on September 28, 2015.

_____
LETITIA Z. PAUL
UNITED STATES BANKRUPTCY JUDGE